UNITED STATES of America,

v.

LAM KWONG–WAH, Appellant.

UNITED STATES of America,

v.

LAM KWONG–WAH, Appellant.

UNITED STATES of America,

v.

LAM KWONG–WAH, Appellant.

Nos. 90–3005, 90–3042 and 90–3038.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 13, 1990.

Decided Jan. 25, 1991.

Blair G. Brown, with whom Roger E. Zuckerman, Washington, D.C., was on the brief, for appellant in all cases.

Heather L. Cartwright, Asst. U.S. Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Stevan E. Bunnell and Frederick W. Yette, Asst. U.S. Attys., Dept. of Justice, were on the brief, for appellee in all cases.

Before WALD, EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Lam Kwong–Wah was convicted after a trial by jury of one count of conspiracy to distribute heroin and to possess heroin with the intent to distribute, in violation of 21 U.S.C. §§ 841(a) and 846, and of one count of attempted distribution of heroin, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A)(i), and 846. The trial judge sentenced Lam to concurrent sentences of 121 months' imprisonment on each count. On appeal, Lam challenges his convictions and his sentencing on several grounds and argues that the trial judge erred in failing to hold an evidentiary hearing on his motion for a new trial. We agree with Lam that venue was improper in the District of Columbia on the attempt-

ed distribution charge and therefore reverse his conviction on that count. We also agree that the trial court erred in sentencing Lam and remand the case for resentencing on the conspiracy count. We reject Lam's argument that there was insufficient evidence supporting his conviction on the conspiracy count and do not reach the issue of sufficiency as to the attempted distribution count. Finally, we reject Lam's assertion that the trial judge abused his discretion in refusing to hold an evidentiary hearing on Lam's motion for a new trial.

## I. BACKGROUND

Lam's trial arose out of an indictment charging him and seven others with a variety of narcotics offenses. Five of Lam's co-defendants pleaded guilty before trial; Lam and the two other remaining defendants went to trial on April 10, 1989. After several days of trial, the other two defendants changed their pleas to guilty, leaving Lam as the sole defendant. The trial then proceeded, leading to Lam's convictions on April 19, 1989, on both counts charged against him. .

The government's evidence established that a conspiracy among defendants other than Lam existed that resulted in several sales of heroin to Indalecio Guzman, an undercover agent of the Federal Bureau of Investigation ("FBI"), prior to April 1988. Lam was implicated in none of those transactions, but the evidence did show his involvement with a transaction for the purchase of 45 pounds (approximately 20 kilograms) of heroin that was to take place on April 15, 1988, in Secaucus, New Jersey. Lam was arrested on that day along with several of the other defendants in a parking lot outside a Secaucus hotel after the delivery of what Agent Guzman assumed to be heroin. Laboratory analysis later revealed that the substance actually was cornstarch.

Negotiations for this transaction took place in Washington, D.C., although Lam was not present during the negotiations. Lam apparently became involved only the day before the transaction took place and played a relatively small supporting role.

The testimony of FBI agent witnesses established that Lam was present when the transaction occurred and that he drove one of the cars observed circling the area shortly beforehand. An expert for the Drug Enforcement Agency testified that Lam's actions prior to the transaction were consistent with "counter-surveillance" techniques often used by Asian drug traffickers to ensure that they are not being ensnared by a police trap. Another government witness, Phylemon Yau, a Cantonese-speaking FBI agent, testified about certain remarks made to him by Lam following Lam's arrest. According to this testimony, Lam claimed that he had been approached the day before in New York by Ng Wah, one of the defendants who had negotiated the transaction with Agent Guzman, and that Ng Wah had said he "wanted to get some stuff." The Cantonese phrase Lam used was "ma fon," which Agent Yau translated literally as "to purchase some powder." Lam then told Agent Yau that he had put Ng Wah into contact with Mah Kwok–Ching, whom he knew to be a heroin dealer, and that he attended a meeting between Ng Wah and Mah at a New York fast food restaurant. Lam stated that he then chauffeured Ng Wah, Mah, and another defendant to Secaucus and, at Mah's request, drove around the area the next morning "to look for police." Finally, Agent Yau testified that Lam claimed that he and his wife had previously informed on Mah's activities to the FBI and that he had cooperated with Ng Wah and Mah in this instance only to gather information for the FBI.

Three witnesses testified for the defense. A language expert testified that "ma fon," the Cantonese phrase used by Lam in his statement to Agent Yau, actually meant "wheat flour." Lam's wife testified that she had acted as an informant for the FBI on Mah's activities and that her husband had helped her obtain information about Mah. Finally, Lam himself testified. He claimed that Ng Wah had asked him to arrange a meeting with Mah, that he had done so, and that he heard the two discuss "something about flour." He also testified that he and his wife had previously in-

formed on Mah's activities to the FBI and that gathering information for the FBI was his sole reason for assisting Ng Wah and Mah. The remainder of his testimony essentially confirmed Agent Yau's testimony concerning Lam's activities in driving Ng Wah and Mah to Secaucus and acting as a lookout. Lam denied any knowledge of the purpose of the transaction, although he admitted that he had thought it was for "something improper."

In rebuttal, the government called an FBI language specialist, who confirmed Agent Yau's testimony that "ma fon" meant "buy powder." He also testified that "fon" was the term all of the other Cantonese-speaking defendants had used to refer to heroin in conversations intercepted by government wiretaps. Another rebuttal witness, Salvatore Forzano, a former New York City police officer who had been detailed to a joint task force with the FBI, testified that Lam's wife had indeed provided information to the FBI on Mah, but that the FBI had had no contact with her for several months before April 1988 because of dissatisfaction with her cooperation. Lam, he testified, had been present on one occasion when his wife met with officers of the task force but had provided no information of his own. The implication of Forzano's testimony was that the FBI suspected Lam's wife of acting as a "double agent" for Mah.

## II. VENUE

Lam argues that venue was improper in the District of Columbia on the attempted distribution count because he did nothing in D.C. in connection with that count. The government responds that venue was proper because Lam, as an aider and abettor, could properly be tried in any district where a principal committed an offense, and several of Lam's co-conspirators committed overt acts in D.C. in furtherance of the attempted distribution of heroin. The trial judge held that venue was proper in D.C. without submitting the question to the jury.

■ The government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against a defendant. *See United States v. North,* 910 F.2d 843, 912 n. 52 (D.C.Cir.1990). Venue may be proper in more than one district. *See id.,* 910 F.2d at 912. In determining whether the government has properly established venue, a reviewing court must view the evidence in the light most favorable to the government. *See, e.g., United States v. Brantley,* 733 F.2d 1429, 1433 (11th Cir. 1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985). Venue is an issue that normally must be submitted to the jury. *See, e.g., United States v. Black Cloud,* 590 F.2d 270, 272 (8th Cir.1979).

■ It is undisputed that the attempted distribution at issue here took place in New Jersey and that all of Lam's conduct in connection with the attempt occurred either there or in New York. Several of the other defendants, however, negotiated about the transaction with Agent Guzman on two occasions in D.C. It is a well-established rule that "a conspiracy prosecution may be brought in any district in which some overt act in furtherance of the conspiracy was committed by any of the co-conspirators," *United States v. Rosenberg,* 888 F.2d 1406, 1415 (D.C.Cir.1989), and Lam does not dispute that venue was proper in D.C. on the conspiracy charge. He does argue, however, that a similar standard should not apply to venue for an attempt and that the absence of any act in D.C. by Lam himself is fatal to the government's assertion of venue there. We agree.

Federal law provides that offenses started in one district but completed in another district may be tried in any district in which the offense "was begun, continued, or completed." 18 U.S.C. § 3237(a). In this case, the evidence established that the attempted distribution was "begun" in D.C. when Lam's co-conspirators negotiated the terms of the deal and gave the undercover FBI agent samples of the heroin they intended to distribute. This contact with D.C. was sufficient to constitute a "substantial step" toward the attempted distribution. *See, e.g., United States v. Rivero,* 532 F.2d 450, 455 (5th Cir.1976). The harder question is

whether the fact that these acts were performed by accomplices of Lam rather than by Lam himself suffices to sustain venue in D.C. for Lam.

The government argues that venue was proper in D.C. under the rule that "[a]n aider and abettor may be tried in the district in which the principal committed the offense." *See United States v. Brantley*, 733 F.2d at 1434 (citing cases holding similarly). Although it is possible that venue could have been sustained under this rule had the government argued that Lam was an aider and abettor, the government, in fact, failed to specify, either in the indictment or at trial, that it was prosecuting Lam on the theory that he was an aider and abettor as opposed to a principal. Furthermore, the jury was not instructed on the issue.

It is true that an indictment need not specifically include an aiding and abetting charge because, "whether specified or not," the federal statute creating liability for aiding and abetting, 18 U.S.C. § 2(b), "is considered embodied in full in *every* federal indictment." *United States v. Michaels*, 796 F.2d 1112, 1118 (9th Cir.1986) (emphasis in original), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987); *see also United States v. North*, 910 F.2d at 913. Although this rule permits a defendant to be convicted as an aider and abettor absent any specific allegation to that effect in the indictment, it does not permit the inference that a jury convicted on that theory where the government did not argue it during trial and the jury received no instructions on it.

Criminal attempt, unlike conspiracy or aiding and abetting, is not a "group" crime; one person acting independently can be guilty of attempt but not of conspiracy or of aiding and abetting. We are therefore unable to infer that a defendant such as Lam, accused only of attempt, aided or abetted the prior actions of other persons in other judicial districts. *See, e.g., United States v. Griffin*, 814 F.2d 806 (1st Cir. 1987) (rejecting "the use of conspiracy venue analysis in crimes not requiring concerted activity"). If the government wishes to establish venue for an attempt in a district where the defendant did nothing but where the defendant's confederates committed criminal acts, it is required to argue and prove that the defendant specifically aided and abetted those acts and to request that the jury be instructed on the issue. Because the government failed to advance any such argument or proof or to obtain a proper jury instruction, we reverse Lam's conviction on the charge of attempted distribution of heroin.

### III. SUFFICIENCY OF EVIDENCE

Lam argues that proof was lacking on an essential element of both the attempted distribution and conspiracy charges: his intent to distribute heroin rather than cornstarch. Although it is established that a defendant may be convicted on narcotics charges even when the substance actually distributed is not controlled, *see, e.g., United States v. Everett*, 700 F.2d 900 (3d Cir. 1983), Lam argues that there must be specific evidence that the defendant thought he was distributing a controlled substance and that courts demand "unequivocal" objective evidence of such intention. The government responds that, at least in the circumstances of this case, no such unequivocal evidence is required. We reject Lam's argument as applied to his conviction for conspiracy; because of our resolution of the venue issue, we decline to reach Lam's challenge to the sufficiency of evidence on the attempted distribution count.

The standard for overturning a guilty verdict on the grounds of insufficiency of evidence is, of course, a demanding one. A conviction should be reversed only where the evidence is such that, viewing it in the light most favorable to the government, a reasonable trier of fact could not have found guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Thomas*, 864 F.2d 188, 191 (D.C.Cir.1988). The evidence "need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Harrell*, 737 F.2d 971, 979

(11th Cir.1984), *cert. denied,* 469 U.S. 1164, 105 S.Ct. 923, 83 L.Ed.2d 935 (1985), 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985). No distinction is made between direct and circumstantial evidence in evaluating the sufficiency of evidence supporting a guilty verdict. *See Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954); *United States v. Staten,* 581 F.2d 878, 882 (D.C.Cir.1978).

■■■ To convict Lam of conspiracy under 21 U.S.C. § 846, the government had to prove "that he entered into an agreement with at least one other person and that the agreement had as its objective a violation of the law." *United States v. Foote,* 898 F.2d 659, 663 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990), —— U.S. ——, 111 S.Ct. 342, 112 L.Ed.2d 307 (1990). The testimony of Agent Yau, if believed, permitted the inference that Lam arranged for Ng Wah to meet with Mah for the purpose of buying heroin and that Lam thereafter willingly assisted Ng Wah, Mah, and others in what Lam believed to be an attempt to distribute heroin. Furthermore, Lam's own testimony incriminated him at least to the extent that he admitted to thinking that "something improper" was afoot, although he denied knowing the precise object of the transaction. Notably, Lam did not claim to have participated in a scheme to defraud Agent Guzman by selling him cornstarch rather than heroin. Especially in light of Agent Yau's testimony, the jury reasonably could have concluded that Lam was indeed aware of the "improper" conduct planned by his confederates and that he believed the impropriety to be the distribution of heroin.[1]

Lam argues, however, that "unequivocal" objective evidence was required concerning his intent to distribute heroin rather than cornstarch and that under this heightened standard the evidence was insufficient to convict him. Lam relies for this proposition on *United States v. Oviedo,* 525 F.2d 881, 885–86 (5th Cir.1976), where the Fifth Circuit held that, to convict a defendant of criminal attempt, there must not only be evidence of the defendant's intent, but also "objective conduct" by the defendant that "strongly corroborate[s] the firmness of the defendant's criminal intent" and that is not "equivocal in nature." Although *Oviedo* clearly is relevant to the sufficiency of evidence supporting Lam's conviction for attempted distribution, as noted above, we do not reach that issue, and we do not believe *Oviedo* can be applied to Lam's conviction for conspiracy. This court, in conformity with virtually every other circuit, has held that 21 U.S.C. § 846, unlike the general federal conspiracy statute, 18 U.S.C. § 371, does not require proof of any overt act. *See United States v. Pumphrey,* 831 F.2d 307, 308–09 (D.C.Cir.1987). The Fifth Circuit itself, in fact, has declined to apply *Oviedo* to conspiracy prosecutions under the federal narcotics laws. *See United States v. Marden,* 872 F.2d 123, 126 (5th Cir.1989); *United States v. Anderson,* 651 F.2d 375, 379 (5th Cir.1981). Moreover, as the Fifth Circuit correctly noted in *Marden,* even where a conspiracy is one that requires proof of an overt act, courts require only that the act demonstrate that the conspiracy no longer exists " 'solely in the minds of the conspirators' "; they do not require unequivocal corroboration of the conspirators' intent. 872 F.2d at 126 n. 4 (quoting *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)). We therefore decline to apply the *Oviedo* standard to Lam's conspiracy conviction.[2]

---

1. The evidence was also sufficient to satisfy the requirement that Lam and at least one other conspirator agreed to distribute heroin. Lam admitted to Agent Yau that Ng Wah's purpose was to "buy powder" and that he arranged a meeting between Ng Wah and Mah, whom Lam knew to be a heroin dealer, for that purpose. In addition, Ng Wah had delivered heroin to Agent Guzman on prior occasions and, prior to his seeking out Mah, provided Agent Guzman with a sample of heroin during negotiations for the April 15 transaction. Even if Mah, who supplied the cornstarch, never intended to deliver heroin in the transaction with Agent Guzman, the evidence supported the inference that Ng Wah did have such an intent.

2. Even if we were to apply *Oviedo* and the law of attempts to conspiracies of the type charged against Lam, we would decline to apply them to the facts of this case. Most federal courts, the

## IV. SENTENCING

Lam argues that, under the federal Sentencing Guidelines in effect at the time of his offense, the trial judge was required to find that he knew or reasonably could have foreseen the weight of the heroin to be distributed and that there was insufficient evidence to support the trial judge's findings on this matter. Although we agree with Lam that proof of scienter was required, we decline to hold that there was insufficient evidence of Lam's knowledge. Instead, for the reasons explained below, we remand the case to the district court for resentencing on the conspiracy count and for clarification of the court's findings.

### A. *Scienter*

█ Lam argues that the trial judge was required to apply the Sentencing Guidelines in effect prior to November 1, 1989, the date on which certain amendments took effect, and that the unamended Guidelines required proof that Lam knew or reasonably should have known the weight of the heroin to be distributed. The government responds that the amended Guidelines applied because they effected no substantive changes in the Guidelines. Although the issue was not argued below, the trial judge apparently proceeded on the assumption that proof of scienter was required. We agree that the unamended Guidelines required proof of scienter and that they, rather than the amended Guidelines, apply to Lam's sentencing.

Lam was sentenced on December 21, 1989, less than two months after the amendments took effect. Sentencing evidently was delayed past November 1 because Lam had a motion for new trial pending on that date. The unamended Guidelines were in effect at the time of Lam's trial and conviction, as well as at the time the presentence report was filed and the parties' sentencing memoranda were submitted. Under 18 U.S.C. § 3553(a)(4), defendants are to be sentenced pursuant to the Guidelines that are in effect "on the date the defendant is sentenced." However, as the government appears to concede, if the amendments to the Guidelines effected substantive changes that would adversely affect Lam's sentencing, then they may not be applied retroactively without violating the *ex post facto* clause of the Constitution. *See Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987).

The question then becomes whether the amendments effected any relevant substantive changes in the Guidelines. It seems clear that, under the amended Guidelines, scienter is not required as a general matter. *See United States v. Suarez,* 911 F.2d 1016 (5th Cir.1990). The amendments deleted from § 1B1.3 of the Guidelines, which provides principles of general application, two important provisions concerning "[t]he conduct that is relevant to determining" the appropriate base level offense: (1) a provision that made it relevant whether "the harm or risk was caused intentionally, recklessly or by criminal negligence"; and (2) a provision that made relevant "the defendant's state of mind, intent, motive and purpose in committing the offense." In *United States v. Burke,* 888 F.2d 862 (D.C.Cir.1989), this court held that these provisions in the unamended Guidelines imposed a general requirement that a sentencing court find scienter in imposing specific provisions of the Guidelines. Although that opinion concerned the mental state necessary to the determination of specific offense characteristics, specifically the

Fifth Circuit included, adhere to the doctrine of attempts contained in the Model Penal Code. *See, e.g., United States v. Dworken,* 855 F.2d 12, 16 (1st Cir.1988); *United States v. Mandujano,* 499 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975). As explained in *Dworken,* 855 F.2d at 17, the Model Penal Code requires that a defendant's overt acts unequivocally corroborate the defendant's criminal intent only where those acts are the sole proof of intent. ·Where, however, there is "separate evidence of criminal intent independent from that provided by the substantial steps (*e.g.,* a confessed admission of a design to commit a crime), then the substantial steps need not themselves be unequivocally indicative of criminal intent—they must merely corroborate that intent." *Id.* at 17 n. 3 (summarizing Model Penal Code § 5.01, comment at 330–31 (1985)). Here, Agent Yau's testimony concerning Lam's statements to him constituted just such "separate evidence" of Lam's intent.

state of mind required to aggravate the sentence of a defendant who possessed a weapon during the commission of a drug crime, its language and reasoning apply equally to the determination of base level offenses such as those at issue here.

In addition, the commentary to § 2D1.4 of the Guidelines in effect prior to November 1, 1989, specifically stated that a defendant convicted on a drug conspiracy charge should be sentenced "only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable." The November 1989 revisions deleted this passage and the provision now directs the reader to the commentary to § 1B1.3. This commentary states that, as a general matter, conduct of co-conspirators must be reasonably foreseeable before a defendant may be held responsible for it, but the revisions also added a crucial qualification to this rule, providing that a participant in a drug conspiracy may be sentenced with reference to the weight of the drugs "notwithstanding any claim on his part that he was neither aware of, nor could reasonably foresee," the quantity of drugs involved.

■ Applying the principles contained in the Guidelines prior to the November 1989 revisions, as well as *Burke's* reminders that " 'ambiguities in criminal statutes must be resolved in favor of lenity' " and that the law applies a presumption against strict liability in the criminal law area, *id.* at 866 (quoting *United States v. Batchelder*, 442 U.S. 114, 121, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979)), we conclude that, under the unamended Guidelines, proof that a defendant knew or reasonably could have foreseen the amount of drugs involved was required before a specific base offense level could be chosen. On remand, then, the trial judge should base his determination of the base offense level on a finding that Lam knew or reasonably could have foreseen that a particular quantity of

drugs was involved in the conspiracy. *See United States v. Suarez*, 911 F.2d at 1020–22 (following *Burke* in holding that scienter generally was required under unamended Guidelines and holding that retroactive application of amended Guidelines would therefore violate *ex post facto* clause).

### B. *Lam's Sentencing*

■ The trial judge sentenced Lam to concurrent sentences of 121 months' imprisonment on each count, based on an adjusted offense level under the Guidelines of 32. Although the parties agree that the trial judge committed an error in calculating Lam's sentence, there appears to be considerable confusion as to the precise nature of that error. Our examination of the transcript of the sentencing hearing leads us to conclude that the judge either made a mistake in selecting the base offense level or erred in applying the Guidelines' instructions concerning the proper reduction in the sentence of a "minimal" participant.

The parties disputed before the judge, as they do again in this court, whether there was sufficient evidence of Lam's knowledge of the weight of the heroin that was to be distributed or that actually was distributed, or of what was reasonably foreseeable to Lam, to justify sentencing him either to a base offense level of 34 (heroin weighing at least 3 but less than 10 kilograms) or to a base offense level of 36 (heroin weighing 10 kilograms or more).[3] The evidence at trial established that the deal agreed to by the undercover FBI agent and Lam's accomplices was for the sale of 20 kilograms of heroin in several installments, with the first installment to consist of 3.4 kilograms. Section 2D1.4 of the Guidelines provided at the time of Lam's conviction that "[i]f a defendant is convicted of participating in an incomplete conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had

---

**3.** Although the Guidelines now assign a base offense level of 36 for quantities of heroin weighing at least 10 kilograms but less than 30 kilograms, *see* Sentencing Guidelines § 2D1.1, at the time of Lam's offense the Guidelines assigned that offense level to any quantity of heroin weighing 10 kilograms or more.

been completed." Under this section, we believe the judge would have been justified in assigning Lam a base level of 36, based on a weight of 20 kilograms (the total amount negotiated), or a base level of 34, based on a weight of 3.4 kilograms (the amount negotiated for delivery in the first installment), so long as there was sufficient evidence of Lam's scienter as to the amount selected.[4]

However, it is unclear from the record whether the judge sentenced Lam on a base level of 36 or on a base level of 34. The crucial passages from the sentencing transcript read as follows:

> The probation officer, with respect to the former [the weight of the heroin] and aligned with the position that the government has taken, held that the Guidelines concerning the attempted distribution of three killograms [sic], or more, was justified and that, of course, is the issue that was put to the jury to find beyond a reasonable doubt. And we would find that as far as the weight of the heroin is concerned, the defendant had knowledge of the fact that he was charged with this and the government proved to the satisfaction of the jury that he knew that this was what he was charged with; that he knew that this was the amount involved, at least.

> Secondly, with respect to his participation in the offense, the probation officer held that the defendant's role in the instant offense was minor and entitling him to a 2–point reduction and in that respect, we would disagree with the probation officer and hold that the defendant's role in the offense was minimal.

> In short, we conclude that the offense level, instead of being 34 should be 32....

Transcript of Sentencing Proceedings at 47. There are several problems and ambiguities buried in these passages: First, the probation officer and the government both recommended a base offense level of 36, based on a weight of 10 kilograms or more, and yet the judge speaks of evidence that Lam knew the weight to be more than 3 kilograms, which would justify only a base level of 34. Second, Lam was charged in the indictment with conspiracy to distribute a "detectable amount" of heroin and with attempted distribution of heroin in excess of one kilogram; no mention was made in either the indictment or the jury instructions of weights in excess of one kilogram. Reliance on "the issue that was put to the jury," then, would at most support a base level of 32 (heroin weighing at least one kilogram but less than 3 kilograms). Finally, if the judge intended to assign a base level of 34, based on a weight of between 3 and 10 kilograms, he miscalculated the reduction Lam deserved for being a "minimal" participant. Under Guidelines § 3B1.2, a "minor" participant in a scheme receives a 2–point reduction, while a "minimal" participant receives a 4–point reduction. Having explicitly found Lam to be a "minimal" participant, rather than a "minor" participant as recommended in the presentence report, the adjusted offense level should have been 30 instead of 32. If, however, the judge intended to assign a base level of 36, based on a weight of 10 kilograms or more, he correctly calculated the adjustment, but failed to justify adequately a base level premised on such a weight.

In sum, the judge could have reached the conclusion that the adjusted offense level "instead of being 34 should be 32" *either* by finding a base level of 36, and then

---

**4.** Lam and his accomplices were arrested following the delivery of the first installment of what Guzman assumed was the heroin he had bargained for. Although no evidence was introduced at trial concerning the actual weight of the cornstarch recovered, the presentence report stated that "the bag that the defendant believed contained the heroin approximated three kilograms...." It is unclear, however, what the probation officer's source for this information was, and it is possible that it reflects nothing more than an assumption that the amount negotiated for the first delivery was the amount delivered. We do not believe that anything material turns on this, however, given that § 2D1.4 requires the court to sentence a defendant convicted in connection with an incomplete conspiracy "as if the object of the conspiracy ... had been completed." There was more than adequate evidence concerning the quantities of heroin that would have been delivered had the conspiracy reached fruition.

reducing it by 4 points because Lam was a "minimal" participant rather than by the 2 points recommended by the probation officer, *or* by finding a base level of 34, and then erroneously reducing it by 2 points on the basis that Lam was a "minimal" participant. Whichever the judge intended, he committed error—in the first instance because he either misstated his findings concerning quantity or believed that a weight of 3 kilograms supported an offense level of 36, and because he erred as to the weight on which the jury was instructed; and in the second instance because he erroneously reduced the base level by 2 points rather than 4 points.

We therefore remand the case to the district court for resentencing and for clarification of the factual findings concerning what Lam knew or reasonably could have foreseen concerning the quantity of drugs involved in the transaction. We decline to hold that there is insufficient evidence to support a finding that Lam had scienter of any particular amount. Although the trial judge on remand should not reopen the record to receive further evidence on this issue, *see, e.g., United States v. Busic*, 639 F.2d 940, 950 (3d Cir.1981) (resentencing "does not permit the prosecution a 'second crack' at supplying evidence"), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981), we do not believe that the evidence before the judge was so clearly insufficient that no finding of scienter can possibly be supported.[5] The judge, who heard all of the evidence and may perhaps draw inferences that we would have difficulty discerning from the paper record, should be given the opportunity to make new findings as appropriate. Neither precedent nor the interests of justice preclude him from doing so.[6]

## V. THE MOTION FOR NEW TRIAL

■ Lam argues, finally, that the trial court erred in refusing to hold an evidentiary hearing on the allegations raised in his motion for a new trial filed pursuant to Fed.R.Crim.P. 33. In brief, those allegations were as follows: (1) Lam's representation by trial counsel violated the sixth amendment's guarantee of effective assistance of counsel; (2) Lam's lack of comprehension of the pretrial and trial process was so extreme that he was denied due process; and (3) the government's admitted failure to produce at trial prior statements of a rebuttal witness violated the Jencks Act. Lam appended to his motion a number of affidavits, including his own, and other supporting material. The trial court denied the motion in an unpublished order filed March 5, 1990, without holding a hearing.

At the outset, it is important to note that Lam is not asking this court to order a new

5. There is at least some evidence in the record that Lam either knew or reasonably could have foreseen that the transaction was for a total of 20 kilograms and/or that 3.4 kilograms was to be delivered in the first installment. The record, for example, indicates that Lam was present during Ng Wah's meeting in New York with Mah and that he then drove both men to Secaucus, where the transaction was to occur. Upon arrival in Secaucus, Ng Wah met with Agent Guzman and informed him that the deal was ready to proceed as soon as they resolved the details concerning the actual delivery of the drugs. Lam's presence during Ng Wah's discussions with Mah prior to Ng Wah's final meeting with Guzman may well be relevant to the issue of Lam's actual knowledge of the quantity to be delivered. Moreover, the preparations for the transaction and the precautions taken by the participants—including the fact that the conspirators travelled from New York to Secaucus and that counter-surveillance techniques were employed—may be relevant to the issue of whether Lam reasonably could have foreseen that some substantial quantity was involved. Of course, it is for the district court on remand to determine in the first instance whether a preponderance of all the evidence supports an inference that Lam knew or could have reasonably foreseen the quantities to be delivered.

6. *See, e.g., United States v. Rivera*, 898 F.2d 442, 445–46 (5th Cir.1990) (district court made insufficient findings concerning knowledge of quantity of drugs involved in conspiracy; case remanded to allow judge to enter new findings); *United States v. Thomas*, 906 F.2d 323, 328 & n. 1 (7th Cir.1990) (district court's findings were inadequate for departing from Guidelines but court was free to make new findings on remand); *United States v. Zamarripa*, 905 F.2d 337, 342 (10th Cir.1990) (same); *United States v. Davis*, 902 F.2d 860, 862–63 (11th Cir.1990) (district court's factual findings as to quantity of drugs involved were inadequate; case remanded for court to make more precise findings).

trial based on his allegations, but rather is asking only that the trial court be ordered to hold an evidentiary hearing on the motion. The basic standard applied by appellate courts in reviewing a trial court's refusal to hold such a hearing is a deferential one, recognizing that "[t]he trial judge has broad discretion in ruling on a motion for a new trial, both in his actual decision and in what he considers before making that decision." *Gaither v. United States*, 413 F.2d 1061, 1078 (D.C.Cir.1969). A motion for a new trial "can ordinarily be decided on the basis of affidavits without an evidentiary hearing, and a district court's decision not to hold such a hearing may be reversed only for abuse of discretion." *United States v. Kelly*, 790 F.2d 130, 134 (D.C.Cir. 1986).[7] As for the standard applied to the trial court's ruling on the claims themselves, there too the court " 'should be reversed only for abuse or misapplication of the law.' " *United States v. Mangieri*, 694 F.2d 1270 (D.C.Cir.1982) (quoting *United States v. Reese*, 561 F.2d 894, 902 (D.C. Cir.1977)). On the facts of this case, we find no abuse of discretion in the trial judge's decision not to hold an evidentiary hearing on Lam's motion.

## A. *Ineffective Assistance of Counsel*

 The claims of ineffective assistance of counsel were rejected by the trial court on the grounds that (1) they did not demonstrate inadequate performance by Lam's trial counsel, and (2) even if they did, Lam had failed to show any prejudice. This inquiry was in accord with *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which holds that, to sustain a claim of ineffective assistance of counsel, a defendant must show both that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.* at 687, 104 S.Ct. at 2064, and that there is "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

On the main ineffectiveness claim raised by Lam, that trial counsel failed to pursue vigorously enough Lam's "public authority" defense based on Lam's claim that he was an informant for the FBI, the trial judge, relying in part on his own recollection of the trial, found that trial counsel had actively pursued the defense and presented it to the jury. Our reading of the claims raised by Lam and of the relevant parts of the trial record amply bear out the trial judge's conclusion.

Lam also argued that trial counsel failed to spend adequate time with him and that counsel's representation was hindered by the language barrier between them. Again, however, the trial judge, based on evidence presented to him of the amount and quality of the contacts, found that there were no grounds here for an ineffectiveness claim. The record shows that trial counsel met with Lam 29 times during the course of his representation, not including trial time, and that Lam was provided with an interpreter both at trial and at meetings with counsel. We can find no fault with the trial judge's conclusion that Lam failed to demonstrate any deficiency in his counsel's performance on this account or, even assuming deficient performance, that any identifiable prejudice resulted from it.

Lam next argued that his trial counsel inadequately explained the advantages of a plea offer from the government and that he would have accepted the offer had he realized the immigration consequences of conviction on the charges against him compared with the more favorable consequences of accepting the government's offer. Once again, however, the trial judge ruled, based on the affidavit of the trial counsel indicating that he thoroughly explained the consequences that would result from rejecting the plea offer, that Lam had failed to demonstrate any ineffectiveness in

**7.** Lam argues that this court should apply the assertedly less deferential standard for holding an evidentiary hearing that applies to motions for new trial filed pursuant to 28 U.S.C. § 2255, which governs collateral claims of trial defects that arise following a defendant's sentencing. However, Lam's motion clearly was filed under Rule 33 rather than § 2255, and we therefore must apply the standards developed for reviewing trial court rulings on Rule 3 motions.

his representation. We find no fault with this conclusion either.

Finally, the trial judge held that Lam had failed to support several other allegations of ineffectiveness, including "counsel's failure to call character witnesses, when none were identified by defendant, or to renew a twice-denied motion for a judgment of acquittal, or to discover the precise meaning of the Chinese term 'ma fon'...." Order filed March 5, 1990, at 6. Again, we find sufficient support for the trial judge's conclusion that Lam failed to make out a case of ineffectiveness based on these assertions. We therefore uphold the trial judge's decision to rule on Lam's ineffectiveness claims without holding an evidentiary hearing.

### B. Lack of Comprehension of Proceedings

■ Lam also claimed in his motion for a new trial that he was denied due process because he was unable to comprehend adequately the proceedings against him due to the fact that he does not speak English and is not familiar with the American legal system. The trial judge, however, found as a matter of fact that Lam was provided with adequate translation services throughout the pretrial and trial proceedings. The record supports this finding, showing that Lam was provided with an individual interpreter at each session of court, that he was always provided with an interpreter when he met with counsel, and that he testified in his own defense through a translator. The Constitution requires no more, and the judge did not abuse his discretion in holding that Lam had been provided with all reasonable services to aid in his comprehension and that he did adequately comprehend the proceedings against him. See, e.g., Valladares v. United States, 871 F.2d

1564 (11th Cir.1989). Furthermore, Lam failed to object to the adequacy of the services provided to him during trial, a factor that at least some courts have held to undercut a claim of inadequate comprehension. See id. ("To allow a defendant to remain silent throughout his trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse.").

### C. Jencks Act Violation

■ Finally, Lam argued in his new trial motion that the government's failure to disclose prior statements of Salvatore Forzano, one of its rebuttal witnesses, was so prejudicial to his defense that a new trial was required. As noted earlier, Forzano's testimony concerned the contacts between the FBI and Lam and his wife. Lam's trial counsel made a timely request under the Jencks Act, 18 U.S.C. § 3500, for statements by Forzano in the government's possession relating to the subject matter of his testimony, and the prosecutor informed him that there were no relevant materials. After trial, it was discovered that the prosecution had failed to locate and turn over several relevant documents concerning Lam's wife's role as an informant.

The trial judge reviewed the material *in camera* and concluded that the documents did not qualify as Jencks material because "they in no way indicated that either defendant or his wife acted as government informants during or close to the events which are the subject of the indictment, or concerned these events in any way." Order filed March 5, 1990, at 3. The judge also found that the materials would not have aided Lam in the assertion of his "public authority" defense. *Id.*

As the government apparently concedes,[8] the trial court erred in holding that none of

---

**8.** The government clearly conceded before the trial court that at least some of the documents were Jencks Act statements of Forzano, *see* Government's Opposition to Defendant's Motion for New Trial at 17 n. 10, and noted that concession in its brief to this court. The government, however, seemed to pull back from that concession somewhat by arguing in its brief to this court that only three documents were even potentially "statements" by Forzano, having been prepared, signed, or initialed by him, and that these documents equally could be viewed as "statements" by other law enforcement personnel who also assisted in their preparation or who signed or initialed them. Having examined the documents ourselves, we have no difficulty in concluding that they fall within the statute's ambit as "written statement[s] made by

the documents qualified as Jencks material; such material need not be affirmatively helpful to the defense in order to be disclosable, but need only "relate[ ] to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). The documents in question clearly did relate to the subject matter of Forzano's testimony. We nonetheless conclude that the failure to disclose the material did not entitle Lam to a new trial or warrant the holding of an evidentiary hearing.

It is true that the harmless-error standard is "strictly applied" to Jencks Act violations because holding an error harmless requires us to " 'speculate whether [Jencks material] could have been utilized effectively' " at trial. *United States v. North American Reporting, Inc.*, 740 F.2d 50, 56 n. 8 (D.C.Cir.1984) (quoting *Clancy v. United States*, 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574 (1961)), *cert. denied*, 474 U.S. 905, 106 S.Ct. 273, 88 L.Ed.2d 234 (1985). We have also held, however, that "the Jencks Act does not contemplate automatic sanctions even when the material has been rendered completely unavailable through loss or destruction," *United States v. Rippy*, 606 F.2d 1150, 1154 (D.C.Cir.1979), and that the trial court must " 'weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial, in order to come to a determination that will serve the ends of justice.' " *Id.* (quoting *United States v. Bryant*, 439 F.2d 642, 653 (D.C.Cir.1971)). Because the Jencks Act is not constitutionally required, *see United States v. Augenblick*, 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969), a court need not find a Jencks error harmless beyond a reason-

able doubt in order to uphold a conviction. *See United States v. Carrasco*, 537 F.2d 372, 377 n. 3 (9th Cir.1976). Further, the Supreme Court has recognized that when the information contained in undisclosed Jencks materials is the same as that provided by the witness at trial, "it would offend common sense and the fair administration of justice to order a new trial." *Rosenberg v. United States*, 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959). *See also United States v. Rippy*, 606 F.2d at 1154 (Jencks violation harmless where evidence of guilt was strong, undisclosed statement was relatively insignificant, and no evidence was adduced of bad faith by government).

Here, the trial judge concededly made an error in concluding that the material at issue was not Jencks material, but he also found that the material was insignificant to Lam's defense and would not have benefitted him. Having reviewed the material ourselves *in camera*, we fully concur with the trial judge. The three documents at issue were of such "marginal utility" to the defense, *see United States v. Rippy*, 606 F.2d at 1154 n. 24, that the failure to disclose them cannot be said to have prejudiced Lam in any manner warranting reversal. The three documents at issue, though relevant to Forzano's testimony, merely confirmed certain aspects of it and thus would not have provided a tool for impeaching Forzano. Furthermore, our review of the record indicates that there was no support in the evidence for Lam's public authority defense, to which Forzano's testimony was directed, even before Forzano took the stand.[9] Even if the Jencks material might have aided cross-examination of Forzano in some way, then, we cannot con-

---

said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1).

9. Although the precise parameters, and indeed the very validity, of the public authority defense are unclear in this circuit, *see United States v. North*, 910 F.2d at 878–81, it seems clear that to have any hope of success a defendant must show at least that he "honestly and reasonably" believed that his actions were being committed pursuant to lawful authority, *see United States v. Barker*, 546 F.2d 940, 949 (D.C.Cir.1976) (opinion of Wilkey, J.), and the belief must be "objec-

tively reasonable." *Id.* at 947–48. Even giving full credence to the testimony of Lam and his wife, there was no evidence that Lam himself had ever been asked to conduct surveillance of Mah's activities for the FBI. In fact, Lam himself testified that he had been warned by an FBI agent that he had no authorization for participating in any narcotics activities with Mah. Thus, even if Lam sincerely believed his actions were sanctioned by public authority, that belief cannot be said to have been objectively reasonable.

clude that this would have assisted Lam's defense in any relevant manner. Finally, Lam presented no evidence to the trial court that the government acted negligently or in bad faith by failing to produce the material; in fact, an affidavit by Forzano filed with the trial court indicated that the failure was inadvertent and was caused by Forzano's misinterpretation of the prosecutor's request for Jencks material rather than by any negligence on the part of the government. We therefore hold that the government's failure to produce Forzano's Jencks material was harmless and that no evidentiary hearing was required on the matter.

### VI. CONCLUSION

Because venue was improperly laid in the District of Columbia on the charge of attempted distribution of heroin, we reverse Lam's conviction on that count. We vacate Lam's sentence on the conspiracy count and remand for resentencing and for more definite findings on the issue of Lam's scienter concerning the quantity of drugs to be distributed.

*So ordered.*