# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 16, 2025          Decided May 23, 2025

No. 21-3051

UNITED STATES OF AMERICA,
APPELLEE

v.

LUZ IRENE FAJARDO CAMPOS, ALSO KNOWN AS LA COMADRE, ALSO KNOWN AS JENNY CAMPOS, ALSO KNOWN AS JENNY AVILES, ALSO KNOWN AS JENCA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00154-1)

———

*Tony Axam Jr.*, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was *A.J. Kramer*, Federal Public Defender.

*Allaya Lloyd*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Kaitlin Sahni*, Acting Deputy Chief, and *Imani Hutty*, Trial Attorney. *Jonathan R. Hornok*, Attorney, U.S. Department of Justice, entered an appearance.

Before: SRINIVASAN, *Chief Judge*, KATSAS, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* ROGERS.

ROGERS, *Senior Circuit Judge*: This is an appeal from a judgment of conviction by a jury of conspiracy with intent to distribute cocaine and manufacture and distribute methamphetamine into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), (b)(1)(H), and 963. The district court sentenced appellant to 264 months' imprisonment and 60 months' supervised release, and ordered appellant to forfeit $18,000,000.

Appellant seeks reversal on multiple grounds, including for lack of proper venue under Article III, Section 2, Clause 3 of the United States Constitution and the Sixth Amendment because no part of the conspiracy occurred in the District of Columbia. Even assuming plain error review is available without a showing of good cause under Federal Rule of Criminal Procedure 12(b)(3), appellant fails to show such error occurred by prosecuting her in the District of Columbia. The remaining challenges are also unpersuasive. Viewing the evidence in the light most favorable to the government, as the court must, the jury could reasonably find the essential elements of the single conspiracy beyond a reasonable doubt. The record is clear that appellant's contention she was denied the effective assistance of trial counsel under the Sixth Amendment fails to show deficient performance by counsel, and her challenges to sentencing and the order of forfeiture present no ground for remand. Accordingly, the court affirms the judgment of conviction.

3

**I.**

By indictment filed in the District of Columbia on August 30, 2016, as amended January 16, 2019, appellant was charged under 21 U.S.C. § 963 with conspiracy to violate 21 U.S.C. § 959 by distributing 5 kilograms or more of cocaine and manufacturing and distributing 500 grams or more of methamphetamine knowing or having cause to believe the drugs would be imported into the United States.[1]  The alleged drug trafficking occurred in Colombia, South America, Mexico, Ecuador, Panama, the United States and elsewhere between January 2010 and the date of the indictment.  U.S. Drug Enforcement Administration ("DEA") agents seized methamphetamine in Arizona in 2012 and county police seized methamphetamine in Mississippi in 2015.  Joint stipulations of the parties established that appellant was arrested in Bogotá, Colombia on March 31, 2017, and voluntarily agreed to accompany DEA agents to the United States.

Challenging her prosecution in the District of Columbia for lack of proper venue, appellant maintains the government never alleged or proved any nexus between the District of Columbia and the charged conspiracy.  Cor. Appellant Br. 7–10.  The evidence presented by the government to prove the violation of Section 959, she states, consisted primarily of

---

[1]  21 U.S.C. § 963 provides: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  During the conspiracy, 21 U.S.C. § 959(a) (1996) provided, in pertinent part: "It shall be unlawful for any person to manufacture or distribute a controlled substance in schedule I or II . . . (1) intending that such substance or chemical will be unlawfully imported into the United States . . . ; or (2) knowing that such substance or chemical will be unlawfully imported into the United States."

methamphetamine transactions in Arizona and Mississippi and related government drug seizures whereas the "vast majority of the evidence consisted of discrete conversations that occurred in Mexico about transactions wholly outside the United States with only an occasional reference to the United States at all." *Id*. at 9–10. The government responds that appellant has waived any challenge to venue by not objecting prior to trial and by not specifying an objection in moving for a judgment of acquittal at the close of the government's evidence, and that the challenge lacks merit.

"The Constitution twice safeguards the defendant's venue right" in Article III, Section 2, Clause 3 and the Sixth Amendment.[2] *United States v. Miller*, 808 F.3d 607, 613 (2d Cir. 2015) (quoting *United States v. Cabrales*, 524 U.S. 1, 6 (1998)). The government bears the burden of establishing proper venue by a preponderance of the evidence. *United States v. Haire*, 371 F.3d 833, 837 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005).

Rule 12(b)(3)(A)(i) of the Federal Rules of Criminal Procedure requires a defendant to challenge improper venue "by pretrial motion if the basis for the motion is then reasonably available." Still, "[i]f a party does not meet the deadline . . . a court may consider the defense, objection, or

---

[2] Article III, Section 2, Clause 3 provides: "The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." The Sixth Amendment to the Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." *See* FED. R. CRIM. P. 18.

request if the party shows good cause." FED. R. CRIM. P. 12(c)(3). A defendant may also object to venue by moving for acquittal at the close of the government's evidence and "specifically" addressing whether venue in the district court was proper. *United States v. Sitzmann*, 893 F.3d 811, 824–25 (D.C. Cir. 2018); *see* FED. R. CRIM. P. 29.

Appellant did not file a pretrial motion to challenge venue, and in moving for a judgment of acquittal at the close of the government's evidence appellant did not specify a venue objection. Neither the government nor the district court had an opportunity to address appellant's concern and even if a venue error may not bar retrial, *Smith v. United States*, 599 U.S. 236, 253–54 (2023), retrials are not without costs, *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Appellant responds that the concern about proper venue "was not apparent to [her] until the close of evidence," noting the extensive nature of the charged conspiracy. Cor. Reply Br. 3–4. Yet in moving for a judgment of acquittal at the close of the government's evidence, appellant did not identify any concern about venue.

The court need not decide whether an untimely Rule 12(b)(3) motion is subject to review for plain error without a showing of a good cause. Other circuits are split. *United States v. Burroughs*, 810 F.3d 833, 838 (D.C. Cir. 2016) (citing cases). Assuming plain error review is available without showing good cause, appellant fails to show plain error that affected her "substantial rights." *Sitzmann*, 893 F.3d at 830 (citation omitted). The court will exercise discretion to correct an error only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration in original) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)); *see* FED. R. CRIM. P. 52(b).

Article III of the Constitution contemplates elaboration on venue requirements in legislation for offenses committed outside of the United States. *See United States v. Dawson*, 56 U.S. 467, 488 (1853). The government relies on 18 U.S.C. § 3238 and 21 U.S.C. § 959(c).

Section 3238 provides:

> The trial of all offenses begun or committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders*, or if no such residence is known the indictment or information may be filed in the District of Columbia.* (Emphasis added.)

The italicized text indicates Section 3238 applies here. Recounting the history of Section 3238, known colloquially as the "'high seas' venue statute" and originating in the Act of April 30, 1790, the United States Court of Appeals for the Second Circuit observed that Section 3238 has been accorded broad meaning and application. *Miller*, 808 F.3d at 616 (citing the First Circuit and its own precedent).

Section 959(c) provided during the period of the charged conspiracy: "Any person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia." 21 U.S.C. § 959(c) (1996). The venue provision has since been removed.

21 U.S.C. § 959 (2017); *see* Nat'l Def. Auth. Act FY 2018, Pub. L. No. 115-91, § 1012(b), 131 Stat. 1283, 1546 (2017).

In *United States v. Thompson*, 921 F.3d 263, 265, 266 n.1, 267 (D.C. Cir. 2019), the court held that the crime of conspiracy under 21 U.S.C. § 963 has extraterritorial application through Section 959(c).  Appellant maintains conspiracy under Section 963 "does not contain a clear statement of extraterritorial effect" and the "presumption against extraterritoriality dictates a lack of jurisdiction and, thus, no basis for venue either." Cor. Appellant Br. 10 (internal citations and quotation marks omitted).  Article III and the Sixth Amendment, appellant continues, "do not allow Congress to set venue wherever it may choose whenever part of a crime was committed extraterritorially." *Id*. at 11 (citing *Salinger v. Loisel*, 265 U.S. 224, 232 (1924); *United States v. Jackalow*, 66 U.S. 484, 486 (1862)).  As illustrative, appellant cites cases involving different venue statutes and factual circumstances.  *Id*. at 11–12.  For instance, *United States v. Trenton Potteries Co.*, 273 U.S. 392, 402–03 (1927), states that "[s]ince the indictment did not charge the formation of the conspiracy or agreement within" a specific district, the district court "was without jurisdiction unless some act pursuant to the agreement or conspiracy took place there."  But the defendants there were indicted for violating the Sherman Antitrust Act and the Supreme Court did not discuss applicable venue statutes. *Id.*  Appellant acknowledges her objection to *Thompson* is made in order to preserve the issue for review by the Supreme Court.  Cor. Appellant Br. 10.

To the extent appellant objects that venue does not lie in the District of Columbia because part of the conspiracy was committed in Arizona and in Mississippi and no part was committed in the District of Columbia, her reasoning is flawed. At common law, the crime of conspiracy takes place upon the

formation of the conspiracy agreement; no overt act is required. *Whitfield v. United States*, 543 U.S. 209, 213–14 (2005); Appellee Br. 24. Consistent with that rule, a Section 963 conspiracy is complete at the moment of the agreement. *United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006). Appellant's reliance on *United States v. Cobar*, Crim. No. 05-451, 2006 WL 3289267, at *5 (D.D.C. Nov. 9, 2006), is misplaced because Section 3238 did not support venue in the District of Columbia where one defendant had formed a conspiracy abroad while another had been first indicted within the United States. Here, neither party disputes that the charged conspiracy began outside the United States, and appellant was not charged in any other district. Appellant's objection that Section 3238 can provide no basis for venue in the District of Columbia because the government failed to prove where the conspiracy began is forfeited, having been raised only in the reply brief. Cor. Reply Br. 9; *see Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008). In any event, overt acts by co-conspirators in one district do not necessarily render venue improper in another district or in the District of Columbia. *See Miller*, 808 F.3d at 619–20 & n.10 (applying two-part test of *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999), and citing cases from the Third, Fourth, and Fifth Circuits).

In *United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006), the court held venue in the District of Columbia was proper under Section 3238 where Gurr "was not arrested or 'first brought' into the United States until after he had been indicted in the District of Columbia." *Id*. at 155 (citations omitted). Appellant, too, was not arrested or "first brought" into the United States until after she had been indicted in the District of Columbia on August 30, 2016. Because appellant has not shown venue for her trial was plainly erroneous, and thus unconstitutional for lack of proper venue, the court has no

occasion to consider whether venue would have been proper under Section 959(c).

Finally, appellant's constitutional challenge to venue based on an asserted lack of any connection between her conspiracy offense and the District of Columbia fails. Because that offense was committed outside of the United States, Congress could provide for venue in the District of Columbia, U.S. Const. Art. III, § 2, cl. 3, and Section 3238 does.

**II.**

Appellant contends the government failed to prove a single conspiracy as charged in the indictment because the evidence "showed numerous separate transactions and agreements with diverse objectives," such as distributing methamphetamine in the United States, manufacturing methamphetamine in Mexico, or distributing cocaine in Mexico and Latin America. Cor. Appellant Br. 15–16. Additionally, none of these transactions "involved overlapping participants working in integrated capacities toward a common goal." *Id.* at 16. Further, appellant maintains, the variance between the indictment charging a "single, overarching methamphetamine and cocaine importation conspiracy and the evidence of multiple separate conspiracies presented at trial" was "fatally prejudicial." *Id.* at 25. Appellant suggests a risk of a "spillover" effect of other crimes evidence from multiple separate transactions, *id.* at 28–33, and claims the failure of the jury instructions to address multiple conspiracies increased the likelihood of a non-unanimous verdict, *id.* at 33–37.

For purposes of determining whether there was a single conspiracy, the court must "ask 'whether the participants'" (1) "shared a common goal," (2) "were involved together in carrying out at least some parts of the plan," and (3) "were

dependent upon one another." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 207 (D.C. Cir. 2013) (quoting *United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009)). Not all the drugs in a single conspiracy need be bound for the United States. *Id.* As the court has long recognized, "[t]he existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury," *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988), and the most important factor is "whether the conspirators share a common goal, such as the possession and distribution of narcotics for profit," *id.* at 1393. Viewing the evidence in the light most favorable to the government, as the court must, *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996), the jury could reasonably find beyond a reasonable doubt that appellant and the co-conspirators were involved in a single conspiracy.

The government introduced evidence at trial that included: (1) the testimony of cooperating witnesses and a "confidential source" about appellant's central role in planning and coordinating the sale and transport of drugs and precursor chemicals, Trial Tr. 584–635 (Dec. 12, 2019); Trial Tr. 772–86, 827–41 (Dec. 13, 2019); (2) the testimony of law enforcement officers, including a DEA expert on the means and methods commonly used by drug traffickers to transport drugs, the street value, and the meaning of specialized terms used in speaking about the drugs and related plans with co-conspirators, Trial Tr. 1159, 1161–68, 1170–71, 1182–96 (Dec. 17, 2019); (3) "BlackBerry" messages between appellant and co-conspirators (identified by aliases) discussing drug purchases and transport, *id.* at 1182–96; (4) telephone calls between appellant and cooperating witnesses about drug transactions in Arizona and Mississippi, Trial Tr. 762–63, 783–86, 832–41 (Dec. 13, 2019); (5) emails: some with photographs and specifications for private aircraft to transport drugs from South America to Mexico; other emails regarding

precursor chemicals used to manufacture methamphetamine; and emails with attached invoices and bills of lading for large amounts of precursor chemicals, Trial Tr. 1070–80 (Dec. 16, 2019); and (6) photographs of drugs seized over multiple years of the conspiracy, Trial Tr. 730–31, 815–16 (Dec. 13, 2019), and of large quantities of drugs or precursor chemicals sent or received by appellant and the co-conspirators, Trial Tr. 1028, 1032, 1034–1036, 1074–75 (Dec. 16, 2019).

Juan Antonio Erbe-Fabela ("Fabela") pulled it all together for the government. He testified that before becoming a "confidential source" for the DEA and adviser on drug trafficking to the Mexican Attorney General's Office, he "perform[ed] favors" for the Sinaloa Cartel, which was a "unification of several different drug trafficking groups" operating on the western side of Mexico. Trial Tr. 573–77 (Dec. 12, 2019). He confirmed that appellant was the "female face of the Sinaloa Cartel." *Id.* at 658–59. Toward the end of 2011, appellant met with him about obtaining favors from the Mexican Attorney General for the Sinaloa Cartel, and by 2012 he and appellant were exchanging 20 to 30 BlackBerry messages a day and meeting in person "almost every day" she was in Mexico City. *Id.* at 581–86.

Fabela's testimony described appellant's central role in planning and coordinating conspirators in the sale and transport of drugs and precursor chemicals, her use of private pilots and purchase of an airplane to transport drugs, and ways she used to protect and move her drugs, including bribing officers at the Mexico City International Airport. His description of appellant's drug operations closely tracked the description by the DEA expert of the methods commonly used in drug trafficking — such as using family members in key roles and transporting cocaine from South America to Mexico, including using private aircraft before crossing the United States' border.

Fabela testified that appellant used commercial aircraft as well to transport an estimated 1,200 to 1,400 kilograms of cocaine through the Mexico City International Airport in a six-month period starting in 2013. Fabela also testified that appellant constructed a laboratory in Hermosillo, Mexico, to produce methamphetamine, where her children handled the day-to-day operations, and she arranged for precursor chemicals to methamphetamine to be transported through Mexican ports.

More particularly, the jury could reasonably find beyond a reasonable doubt:

1. Appellant, much like the "higher ups" in the drug distribution network in *Lopesierra-Gutierrez*, 708 F.3d at 207, was the "main conspirator" who organized, brokered, and coordinated the charged drug trafficking operations and "work[ed] with all the participants" for the purpose of importing drugs for profit through her drug distribution network. Fabela testified that appellant, as the female face of a major drug cartel, organized the importation of cocaine from South and Central America into Mexico by bribing the federal police in Mexico and hiring pilots of private planes to transport the drugs. Trial Tr. 599–612 (Dec. 12, 2019). In BlackBerry messages appellant told Fabela to contact officials "in a command position of the government at the airport to get permission" to import cocaine. *Id.* at 601. Appellant began branding her cocaine with her alias, "Jenca." Trial Tr. 1022–23 (Dec. 16, 2019); Trial Tr. 1183 (Dec. 17, 2019). Fabela also testified that appellant "buil[t]" the methamphetamine laboratory in Mexico, Trial Tr. 626–33 (Dec. 12, 2019), and BlackBerry messages with one of her children indicated her role in pricing the drug and in buying and coordinating delivery of chemicals to manufacture it, Trial Tr. 1041–43 (Dec. 16, 2019); Trial Tr. 1130 (Dec. 17, 2019). Fabela confirmed as well that appellant had "comment[ed]" about "sending her

drugs to the United States," and told him that she had distribution offices in Chicago, Philadelphia, Atlanta, and Miami. Trial Tr. 635 (Dec. 12, 2019). BlackBerry messages showed appellant contacted persons using aliases ("Pak-Man," "Jaen," "Doroteo," "ArleeS," and ".tony (260001EE)") about sending drugs into the United States including in Boston, Houston, Dallas, and New York, and to Canada.

From this evidence the jury could reasonably find that the drug transactions involved cocaine and methamphetamine, and that the individuals involved "had an interest in furthering the distribution of [the drugs]" for profit through appellant's drug trafficking operations, which, in turn, showed that they "shared a common goal with the other participants." *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999). Although some of the drugs appellant distributed were not bound for the United States, that alone "fails to demonstrate the existence of multiple conspiracies." *Lopesierra-Gutierrez*, 708 F.3d at 207.

2. There was overlap among the co-conspirators. Appellant participated either directly or indirectly in the transactions about which Fabela and other witnesses testified and she discussed in BlackBerry messages. *See United States v. Mathis*, 216 F.3d 18, 23–24 (D.C. Cir. 2000). Some participants may not have known each other, Cor. Appellant Br. 17, but "there is no requirement that each conspirator know the identity of every other conspirator" provided they know of the larger conspiracy and need for other participants. *United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C. Cir. 1991). Indeed, "any overlap among the participants in the allegedly separate conspiracies" may be supportive of a single conspiracy. *Mathis*, 216 F.3d at 23. Here, key players overlapped — appellant's children were involved in cocaine and methamphetamine activities and worked with other co-conspirators.

3. Appellant and the co-conspirators were interdependent because "each defendant's actions 'facilitate the endeavors of other alleged co-conspirators or facilitate the venture as a whole.'" *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 900 (D.C. Cir. 2010) (internal citation omitted). Interdependence exists where there is "evidence that [a defendant] engaged in an interlocking web of drug transactions geared toward the common purpose of possession and distribution of narcotics for profit with other key players." *United States v. McGill*, 815 F.3d 846, 929 (D.C. Cir. 2016). When, as here, "there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use," participants in the transactions "may be presumed to know that they are part of a broader conspiracy." *United States v. Medina*, 944 F.2d 60, 65–66 (2d Cir. 1991); *see United States v. Dickey*, 736 F.2d 571, 582–83 (10th Cir. 1984). The duration and regularity of dealings, as here, also distinguishes a conspiracy from *ad hoc* buyer-seller transactions by supporting the inference that co-conspirators knew they were part of a larger distribution network. *See McGill*, 815 F.3d at 929; *United States v. Baugham*, 449 F.3d 167, 171–72 (D.C. Cir. 2006); *United States v. Edwards*, 945 F.2d 1387, 1393 (7th Cir. 1991).

The government's evidence — including BlackBerry messages about large shipments of drugs and emails with attached invoices and bills of lading for wholesale quantities of precursor chemicals — showed multiple agreements to purchase large quantities of chemicals to manufacture methamphetamine, and agreements between appellant and persons using aliases ("tapiño" and "Doroteo") for sale, purchase, and transport of large quantities of drugs, including cocaine, to be imported into the United States and elsewhere. From this evidence the jury reasonably could find that "the

[participants] knew or must have known that others unknown to them were sharing in so large a project . . . [even if] they did not know" their identities or roles. *Blumenthal v. United States*, 332 U.S. 539, 558 (1947).

Appellant counters that the government "attempted to prove a chain conspiracy," Cor. Appellant Br. 26, but alleged appellant "was at the center of a single conspiracy that resembled a hub with many spokes of a wheel" without showing a "rim" enclosing the "spokes," *id.* at 16. The hub-and-spoke metaphor does not apply to all conspiracies, including drug conspiracies, *Tarantino*, 846 F.2d at 1392, and the court need not decide whether the government alleged appellant headed a chain or hub-and-spoke conspiracy. The jury found appellant was responsible for 5 kilograms or more of cocaine and 500 grams or more of methamphetamine, as specified in the indictment. A special verdict form (Dec. 18, 2019) showed the jury found appellant guilty of a "[c]onspiracy to distribute cocaine, intending or knowing that it would be imported into the United States" and guilty of a "[c]onspiracy to distribute and/or manufacture methamphetamine, intending or knowing" the same. "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Griffin v. United States*, 502 U.S. 46, 56–57 (1991) (quoting *Turner v. United States*, 396 U.S. 398, 420 (1970)). Here, the government presented evidence from which the jury could reasonably find beyond a reasonable doubt the key elements of a single conspiracy — by reason of evidence of a common goal, overlap of participants, and interdependence.

**III.**

To succeed on an ineffective assistance of counsel claim under the Sixth Amendment to the Constitution, a defendant must demonstrate (1) "counsel's performance was deficient" because it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense" because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 688, 694 (1984). A court need not address both prongs of the *Strickland* test if the showing on one is insufficient. *United States v. Henderson*, 108 F.4th 899, 903 (D.C. Cir. 2024) (quoting *Strickland*, 466 U.S. at 697); *United States v. Kelly*, 552 F.3d 824, 831 (D.C. Cir. 2009). This court usually will not resolve ineffective assistance of counsel claims on direct appeal unless "the trial record alone conclusively shows that the defendant is entitled to no relief, [or] when the record conclusively shows the contrary." *United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997) (internal citation and quotations omitted). This is such a case.

Appellant contends that trial counsel's failure to request instructions requiring the jury to determine whether the government proved the single conspiracy charged in the indictment rather than multiple conspiracies seriously prejudiced her. Cor. Appellant Br. 39. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Defense counsel argued to the jury that appellant was a "mother and a grandmother" who willingly came to the United States for trial because she knew she was innocent. Trial Tr. 548 (Dec. 11, 2019). Counsel attacked the credibility of the

government's cooperating witnesses by emphasizing that they had "a history of criminality and a history of lying." *Id.* at 544. Counsel also argued to the jury that the government had failed to connect appellant with any conspiracy because there was no evidence such as photographs or video showing appellant ever met with any of the "cooperators." Trial Tr. 1325 (Dec. 18, 2019).

Under the circumstances, the record clearly demonstrates that "[d]efense counsel reasonably could have concluded that the strength of [appellant's] claim to innocence would have been dissipated by arguing to the jury that [appellant] was part of a conspiracy to distribute [drugs], but . . . was not part of the conspiracy charged in the indictment." *United States v. Driver*, 798 F.2d 248, 255 (7th Cir. 1986). Appellant's position that "[t]here was no strategic reason for counsel's failure," Cor. Appellant Br. 41, is mistaken. Consequently, because counsel's failure to request instructions did not fall "below an objective standard of reasonableness," appellant has not met the first prong under *Strickland* and her Sixth Amendment challenge fails.

## IV.

Appellant challenges her sentence on the grounds that the district court erred in applying the Sentencing Guidelines by: (1) holding her responsible for 3,000 kilograms of cocaine; (2) enhancing her sentence for using non-commercial aircraft to import drugs; (3) holding her responsible for bribing law enforcement; (4) finding she maintained a drug premises; and (5) finding she was an organizer or leader of the charged conspiracy. Appellant also contends the district court erred in finding she obtained $18,000,000 in drug proceeds subject to forfeiture. Upon review, these challenges fail.

The court reviews legal questions *de novo*, *United States v. Cook*, 594 F.3d 883, 886 (D.C. Cir. 2010), and the court reviews a timely objection to sentencing decisions for abuse of discretion, *United States v. Iracks*, 106 F.4th 61, 66 (D.C. Cir. 2024); *see Holguin-Hernandez v. United States*, 589 U.S. 169, 173 (2020).  "That review, while deferential, looks for 'significant procedural error,' 'clearly erroneous' factual findings, or a sentence that is substantively unreasonable." *United States v. Gonzalez-Valencia*, 133 F.4th 1072, 1076 (D.C. Cir. 2025) (internal citation omitted).  Where no objection is raised at sentencing, court review is confined to plain error, and it will vacate a sentence "only if it impinges upon the defendant's substantial rights in a way that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Mack*, 841 F.3d 514, 525, 526 (D.C. Cir. 2016) (internal quotations and citations omitted). "An error is plain if the district court contravened an opinion by this circuit or the Supreme Court on the issue, or some other absolutely clear legal norm." *Gonzalez-Valencia*, 133 F.4th at 1077 (internal quotations and citations omitted).  "In the special context of sentencing," this court has long acknowledged that the plain error prejudice requirement is "less exacting than it is in the context of trial errors." *United States v. Saro*, 24 F.3d 283, 287 (D.C. Cir. 1994).  Virtually the same standards of review apply to review of an order of forfeiture.  *United States v. Bikundi*, 926 F.3d 761, 792 (D.C. Cir. 2019); *United States v. Wheeler*, 753 F.3d 200, 210 (D.C. Cir. 2014).

(1) Appellant did not object to the drug weight calculation in the presentence report or to the district court's base offense level determination, which was governed by the quantity of drugs attributed to appellant.  Cor. Appellant Br. 48–51.  In view of the trial evidence, appellant's counsel chose not to object.  Sent. Tr. 9 (July 27, 2021).  Appellant's drug weight

quantity objection is waived. *United States v. Laslie*, 716 F.3d 612, 615 (D.C. Cir. 2013).

(2) Appellant maintains enhancement under U.S.S.G. § 2D1.1(b)(3)[3] requires use of a private plane to cross the United States' border to import the drugs. Cor. Appellant Br. 52–54. Finding no such limitation in the text of the Guideline, the district court concluded that "where the private aircraft was used during one leg of the importation scheme," the enhancement applies. Sent. Tr. 15.

The Guideline refers to a private plane "used to import . . . the controlled substance." Three circuit courts of appeals have concluded application of this enhancement does not require proof of conviction of the substantive offense of the conspiracy, *United States v. Flores*, 945 F.3d 687, 722–26 (2d Cir. 2019); *United States v. Rendon*, 354 F.3d 1320, 1329–30 (11th Cir. 2003); *United States v. Rodriguez*, 215 F.3d 110, 124 (1st Cir. 2000), and the Eleventh Circuit concluded the Guideline does not require a private plane be used on the last leg of a drug's journey, *see United States v. Iacullo*, 140 F. App'x 94, 102 (11th Cir. 2005). Only the Ninth Circuit has focused on the past tense "used to import" to conclude this enhancement only applied when a private plane was used

---

[3] Guidelines § 2D1.1(b)(3) (2010) provides:

> If the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was *used to import or export the controlled substance*, (B) a submersible vessel or semi-submersible vessel as described in 18 U.S.C. § 2285 was used, or (C) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance, increase [the offense level] by 2 levels. (Emphasis added.)

during the last leg of the journey to bring the drugs across the border into the United States. *United States v. Joelson*, 7 F.3d 174, 179–80 (9th Cir. 1993), *cert. denied*, 510 U.S. 1019 (1993), and the Second and the Eleventh Circuits have rejected that approach, *Flores*, 945 F.3d at 722, 726–27; *Iacullo*, 140 F. App'x at 102. The Sentencing Commission amended the existing Guidelines, as relevant, to "clarif[y] and simplif[y] the guideline provisions dealing with attempts and conspiracies in drug cases." Guidelines Appendix C, Vol. I, Amendment 447, at 324 (eff. Nov. 1, 1992).

The Second Circuit rejected the Ninth Circuit's interpretation of the Guideline and understood the Sentencing Commission to make no substantive change in Amendment 447. *Flores*, 945 F.3d at 725. That circuit's thorough analysis offers persuasive reason to conclude that the district court did not err by failing to limit application of the enhancement to the last leg of the drugs' journey into the United States. Even assuming error, the error was harmless. The district court stated, on the record at sentencing, that appellant's offense level would still be 43 or above and her sentence would be life imprisonment even without one or two of the sentencing enhancements. Sent. Tr. 45. The government points out, moreover, a court may apply a two-level increase under U.S.S.G. § 2D1.1(b)(5) for the importation of methamphetamine if the two-level aircraft enhancement under Section 2D1.1(b)(3) does not apply. U.S.S.G. § 2D1.1 cmt. n.12.

(3) The district court did not clearly err in applying a bribery enhancement under U.S.S.G. § 2D1.1(b)(11). Cor. Appellant Br. 55–56. The court relied on Fabela's testimony that (1) appellant "had a group of federal police at the airport who were working with her and there wouldn't be a problem" when she wanted to use the airport to ship her drugs, and (2)

"some police officers came out" at the Mexico City International Airport who "were dressed in blue, and they loaded three boxes" that contained cocaine "into the trunk of the car." Sent. Tr. 29. On their face, these statements undercut appellant's objections that being "dressed in blue" is insufficient evidence to show the men were law enforcement officers and that she conveyed or attempted to convey a bribe to an officer.

(4) Neither did the district court clearly err in applying the drug-premises enhancement under U.S.S.G. § 2D1.1(b)(12). Cor. Appellant Br. 56–59. Guidelines commentary advises the court to consider "whether the defendant held a possessory interest in" the premises and the extent the defendant "controlled access" or "activities" at the premises. U.S.S.G. § 2D1.1 cmt. n.17; *see United States v. Carter*, 834 F.3d 259, 262 (3d Cir. 2016). There was evidence that appellant built the methamphetamine laboratory in Hermosillo, Mexico, and that she referred to bringing chemicals to produce methamphetamine through Mexican ports. True, the district court did not refer to "direct evidence" that appellant personally controlled daily activities at the laboratory, but the district court could reasonably find, given appellant's construction of the methamphetamine laboratory and its operation by her children, that "it would strain credulity" to say appellant did not maintain a drug premises. Sent. Tr. 35–36. Even assuming error, the district court stated that appellant's offense level would still be 43 or above and her sentence would be life imprisonment not applying a couple of the enhancements. *Id*. at 45.

(5) Nor did the district court clearly err in applying a leadership role enhancement under U.S.S.G. § 3B1.1(a). Cor. Appellant Br. 59–63; Sent. Tr. 44. Evidence of appellant's controlling role at key stages of the drug trafficking operation

indicated appellant organized and controlled the distribution of large amounts of cocaine and the manufacture and distribution of large amounts of methamphetamine with intent to import the drugs into the United States and elsewhere. Appellant "brand[ed]" cocaine with her alias, "Jenca," and she "buil[t]" the methamphetamine laboratory operated by her children. That appellant was involved in multiple transactions and agreements is not the same as showing that the jury could not reasonably find that there was a single conspiracy in which appellant occupied the key leadership role. *See Tarantino*, 846 F.2d at 406–08. Moreover, the record as a whole shows that any "error did not affect the district court's selection of the sentence imposed." *United States v. Kpodi*, 824 F.3d 122, 129 (D.C. Cir. 2016) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)).

Finally, appellant contends that the order requiring forfeiture of $18,000,000 must be reversed as a matter of law. Cor. Appellant Br. 63–66. She maintains that she is being held accountable for drug proceeds she never "actually acquired," and that the district court clearly erred in concluding she obtained $18,000,000 from the drug conspiracy during the six-month period in 2013 on which the district court relied. *Id.* at 64–66. At sentencing appellant objected to forfeiture "on principle" because she did not have the money. Sent. Tr. 81. On appeal, she objects that she had not "actually acquired" the money forfeited. Cor. Appellant Br. 64–66.

A person convicted of conspiracy under 21 U.S.C. § 963 "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." 21 U.S.C. § 853(a)(1). The forfeiture is generally limited to property the defendant actually acquired as the result of the crime. *Honeycutt v. United States*, 581 U.S. 443, 454 (2017). *United*

*States v. Leyva*, 916 F.3d 14 (D.C. Cir. 2019), controls here. There, the court affirmed attribution to "the leader of [an] organization" of the "proceeds from activities directly supervised by" him in a conspiracy to import drugs into the United States. *Id.* at 19, 31. The court acknowledged that the "case law . . . was (and is) far from clear that property acquired by an organization cannot qualify as property 'obtained, directly or indirectly' by a leader of that organization," *id.* at 30, but concluded neither *United States v. Cano-Flores*, 796 F.3d 83, 91 (D.C. Cir. 2015), which stated 21 U.S.C. § 853 provides for "forfeiture *only* of amounts 'obtained' by the defendant on whom the forfeiture is imposed," nor *Honeycutt* "involve[s] the leader of an organization, and hence did not close this potential exception," *id.* at 31.

The district court found that appellant obtained $18,000,000 "directly and some part indirectly" from persons under her control based on the volume of cocaine brought through the Mexico City International Airport in suitcases. Sent. Tr. 82. Fabela testified that appellant had the Mexican federal police "working with her," had Fabela "accompany her bodyguard" at the airport so that "everything turned out okay," and "stopped importing cocaine" through the airport when "things got hot." Trial Tr. 603–05 (Dec. 12, 2019). In basing the forfeiture amount on six months of activity beginning in 2013, Sent. Tr. 81–82, about which Fabela testified, Trial Tr. 599–606 (Dec. 12, 2019), the district court did not account for the total proceeds of the six year conspiracy, including an estimated ten kilograms of methamphetamine that the district court included in the base offense level, Sent. Tr. 8; *see* Joint Mot. to Am. Indictment 1. On this record, appellant fails to show the district court plainly erred in attributing these proceeds from the drug trafficking operations under her control.

Accordingly, the court affirms the judgment of conviction.